1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY BERNARD SMITH,

11              Petitioner,              No. CIV S-03-1871 LKK KJM P

12        vs.

13   B. CURRY,[1]                        ORDER AND

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  He challenges his Sacramento County conviction for

18   burglary, robbery, and oral copulation by force or violence and the resulting determinate term of

19   twenty years, followed by a term of twenty-five-years-to-life.[2]

20   /////

21   /////

22   /////

23   _____

24        [1]  Petitioner has filed a motion to change the name of the respondent, alleging that
     Anthony Kane, the current respondent, has been replaced as warden by B. Curry.  The court
     grants the motion.  Fed. R. Civ. P. 25.
25

26        [2]  Before trial, petitioner pleaded guilty to an unrelated burglary and does not challenge
     that conviction here.  RT 682-687.

                                      1

I.  Factual and Procedural Background

The state Court of Appeal's account of the facts as developed at trial comports
with this court's reading of the record:

Eugene and Deanna S., the victims, lived on Center Parkway in
Sacramento.  At the time of trial, Mr. S. was 71 years old; Mrs. S.
was 56.

On September 6, 1997, Mr. S. won $4,000 gambling in Reno.  That
evening, Mrs. S. mentioned this fact to Robert McKinsey, a former
coworker . . . .

On the afternoon of Sunday, September 7, 1997, the S.'s were at
home; Mr. S. was watching football on television in the living
room, while Mrs. S. was in the bedroom styling her hair.  The
doorbell rang.  Opening the solid front door, Mr. S. saw a tall
African-American man (later identified as defendant) wearing a
white T-shirt, standing with a folded newspaper in his hand.
Defendant said he was soliciting subscriptions to the Bee.  Mr. S.
said he was not interested and returned to his couch, but failed to
lock the screen door.

Defendant followed Mr. S. inside and held a gun to his head,
saying, "We know you got money, where is it at?"  When Mr. S.
denied having money, defendant hit him with his hands and with
the gun and ordered him to give up the money.

Seconds later, another African-American man (later identified as
Hinex), wearing a plaid shirt and a baseball cap, came through the
screen door and closed it. [Footnote omitted.]  Hinex also
demanded money.  Defendant threatened to shoot Mr. S. if he did
not produce the money.  Mr. S. gave his wallet to Hinex, who
extracted $8 and put the bills in his pocket.

Defendant asked Mr. S. if his wife was home.  Mr. S. said she
might be in the shower or at her father's house next door.
Defendant told Hinex to keep watch on Mr. S., then went to look
for Mrs. S.

Mrs. S, who was still in the bedroom, dressed in a T-shirt and
underpants after her shower, had heard the earlier events and taken
fright.  She called 911 while hiding between the wall and the bed.
When she heard defendant coming, she hung up the telephone, hid
the phone under the bed, then hid herself by the side of the bed.

/////
/////
/////

2

Defendant entered the bedroom and went through the closet, nightstand, and dresser drawers.  Getting up onto the bed, he spotted Mrs. S. and said, "There you are, bitch, there you are."  As she rose, he slapped and kicked her.  He asked if she had called the police; she claimed she had not had time.

Defendant ordered Mrs. S. to take off her clothes, threatening to shoot her if she did not comply.  She partially removed her T-shirt and held it against herself.  Holding the gun on her with one hand, he tried to wipe off fingerprints in the bedroom with his T-shirt.  She told him she had a hundred-dollar bill in her wallet; he forced her to give it to him.

Defendant then told Mrs. S.: "You are going to suck my dick."  Standing on top of the mattress with his pants lowered, he put the gun to her head and forced her to orally copulate his penis.  After he ejaculated in her mouth, she spit the ejaculate onto the carpet.

About this time, defendant and Mrs. S. heard sirens.  He said, "Bitch, you did call the cops" and threatened to come back and kill her.

In the meantime, Hinex had menaced Mr. S. with a steak knife in the living room, taken apart a gift-wrapped package, pocketed Mr. S.'s checkbook and electronic organizer, and torn the telephone off the wall.  Hinex had then grabbed Mr. S. at knifepoint, walked him up and down the hall near the bedroom, then knocked on the door and opened it.  When he and Mr. S. entered, Mrs. S. was on her knees; defendant had his shirt in his hand and was pulling up his pants.  Mr. S. yelled: "You bastard, you raped my wife."

Hinex told defendant that they had better leave because the cops were here.  The two men ran out the front door.

A number of Sacramento police officers responded to the 911 call.  Officer August Johnson arrived on the scene in his patrol car, turning the siren off as he approached; stopping and parking nearby, he walked partway to the S. residence, heard nothing, and retreated to wait for backup.  Another police car came by with its siren still on; as it passed by the residence, Johnson saw two men run out the door, one with a shirt on and one without.  One of them threw a knife into a flowerbed.  Johnson gave chase on foot; the two men split up, and Johnson failed to catch either.

As other officers pursued defendant and Hinex, Johnson went back to the S. residence and interviewed the victims.  Mr. S. told him that both robbers were around six feet tall and 160 pounds.

/////

/////

3

Officer Eric Poerio, on patrol with his canine partner Ajax, responded to the reported robbery. Ajax detected and detained Hinex in a yard several houses from the S. residence. Poerio and Ajax located no other suspects.

Officer Kathleen Fritzsle took custody of Hinex. Searching his person, she found $8 in his front pocket and $40 to $50 in his back pocket.

Detective Charley Woodward interviewed Mrs. S., who told him about the sexual assault.

Officer Johnson took the S.'s to where Hinex was detained in a patrol car and drove by at a distance of 40 to 75 feet. The S.'s identified Hinex as one of the perpetrators.

On September 8, 1997, Detective Peter Willover showed Mrs. S. two photo lineups. The first included Hinex and defendant, along with "fillers" (i.e., nonsuspects); the second included Hinex and fillers, but not defendant. Looking at the first lineup, Mrs. S. tentatively identified defendant as the person who assaulted her; looking at the second lineup (which included Hinex, but not defendant), she identified a filler as the person in that lineup who most closely resembled her assailant.

In an interview, Mrs. S. told Detective Willover about spitting defendant's ejaculate out (a detail she had not told the officers the day before). The police collected residue samples of semen from Mrs. S.'s T-shirt and the bedroom carpet.

Also on September 8, 1997, Detective Willover conducted two taped interviews with Hinex. After waiving his *Miranda* rights, he admitted his participation in the home invasion robbery, but denied sexually assaulting Mrs. S. He also specifically inculpated defendant in both the robbery and the forcible oral copulation, calling him by his first name and nickname. [Footnote omitted.] Hinex's girlfriend, Medra Hunter, provided defendant's full name.

During the questioning, defendant telephoned Hunter and told her to tell Hinex "not to be mad at him because the shit didn't go down like the lady said it did." Hunter passed on this information to Willover. Hunter later identified defendant in a photo lineup.

In the course of the investigation, Hinex's cousin Chris McCurin informed Detective Willover about where a gun used in the crimes might be found. On September 11, 1997, the police turned up a .38-caliber revolver in a weedbed on a property a few blocks from the S. residence, farther north and east than the point where Hinex had been stopped and arrested.

/////

Detective Willover acquired information at some time from an unspecified source that McCurin might have been involved in the commission of the crimes.  At trial, he testified that he had not had contact with McCurin in over a year and did not recognize him from a photograph.

Defendant was arrested on September 12, 1997.  The police took samples of his blood, saliva, head hair, and pubic hair.

Detective Willover conducted a tape-recorded interview with defendant in custody on the day of his arrest.  (The tape was played for the jury.)  After waiving his *Miranda* rights, defendant admitted that he took part in the burglary and robberies, having heard about Mr. S.'s gambling winnings from either "Chris" (i.e., Chris McCurin) or "Rob" (i.e., Robert McKinsey).  But defendant denied sexually assaulting Mrs. S.  According to defendant, he and Hinex entered her bedroom together, defendant armed with a gun and Hinex with a knife; defendant obtained $100 from Mrs. S., but never pulled down his pants while in the bedroom.  Hinex at some point brought Mr. S. into the bedroom, then took Mrs. S. to another room.  Defendant and Hinex handed the gun back and forth between them during the incident.  Hearing sirens, defendant fled the residence, taking the gun, which he discarded as he ran.

Samples of blood and saliva taken from the victims and the defendants, and the semen and saliva samples taken from Mrs. S.'s T-shirt and the bedroom carpet, were subjected to various tests.  Blood testing determined that defendant's blood type was B or AB, Hinex's blood type was O, Mr. S.'s blood type was A, Mrs. S.'s blood type was B, and all four persons were secretors (i.e., their bodily fluids would all reveal the same biological "signature").  This testing excluded Hinex and Mr. S. as the donor of the saliva samples on Mrs. S.'s T-shirt and the carpet, but did not exclude defendant.

Defendant's DNA was analyzed and matched against the semen and saliva samples from the T-shirt and carpet, using a method that matches six different loci, or chromosome markers.  Criminalist Jill Spriggs, who performed the analysis at the Sacramento County crime laboratory, concluded that of the three males involved in the case (Mr. S., defendant, and Hinex) only defendant could have donated the sperm found in the T-shirt.  Sprigs also calculated that one out of every 1,450 African Americans, one out of every 19,500 Caucasians, and one out of every 17,500 Hispanics would have the same combination of genetic traits found in defendant's DNA and in the sperm sample.

/////

/////

/////

Defense Case

Hinex testified on his own behalf; defendant did not. According to Hinex's testimony, he, defendant, and Chris McCurin spent the earlier part of September 7, 1997, together; they stopped in at the home of Rob McKinsey for awhile. At some point, a friend called "JB" picked them up. Defendant said he had to "make a run," i.e., do a drug deal. They drove to a house on Center Parkway, which afterward turned out to be the S. residence. Defendant weighed out some drugs, put them into a newspaper, walked to the front door with the newspaper, and knocked, while Hinex and "JB" waited in the car. After going inside, defendant came back out, angrily saying that the person inside was playing with his money and "tripping." McCurin went to the door with defendant; they entered, defendant going first. Hinex and "JB" continued to wait outside. After a while, Hinex went up to the door and knocked without response; then he returned, knocked again, looked in the window, and saw McCurin and defendant holding a man at gunpoint and asking where defendant's money was. Hinex reported back to "JB," who was eager to leave. Hinex said he would go get the others and went back to the front door; McCurin told him to act as lookout and closed the door again. Hinex once more returned to "JB" to report back, then went to the front door again. Now he heard sirens. "JB" drove off. Opening the screen door and the front door, Hinex saw defendant and McCurin in the hall; he stepped inside the entryway just in time to be almost knocked over by defendant and McCurin running out. Emerging, Hinex saw an officer, who told him to freeze; instead, the frightened Hinex took off running until he reached a hiding place in a nearby yard. After his arrest and detention, he saw McCurin riding by on a bicycle; McCurin signaled that Hinex was not to talk. Hinex, who feared McCurin, obeyed. Hinex could not remember what statements he gave to the police. [Footnote omitted.]

Defendant presented Dr. Laurence Mueller, a professor of ecology and evolutionary biology, as an expert witness on DNA evidence. Dr. Mueller questioned the validity of the statistical methods used to calculate the likelihood of defendant being the donor of the semen samples; he also explained how crime labs can produce false positives in DNA testing. Dr. Mueller conceded that the National Research Council, a branch of the National Academy of Sciences, had issued a report approving the DNA testing and calculating methods used in this case and specifically rejecting his criticisms of those methods.

A defense investigator testified that he had tried and failed to serve subpoenas on Robert McKinsey and Chris McCurin. He also testified that defendant had a chest tattoo and a leg scar. . . . .

/////

1      Rebuttal

2      A fingerprint expert who had been asked to compare latent prints
       from the S. residence with the known fingerprints of Chris
3      McCurin testified that none of the 12 latent prints could be
       identified as his, and seven of them were certainly not his.
4

5  Court of Appeal Opinion at 3-12.[3]

6  II.  Standards Under The AEDPA

7           An application for a writ of habeas corpus by a person in custody under a

8  judgment of a state court can be granted only for violations of the Constitution or laws of the

9  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

10  claim decided on the merits in state court proceedings unless the state court's adjudication of the

11  claim:

12           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established federal law, as
13           determined by the Supreme Court of the United States; or

14           (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
15           State court proceeding.

16  28 U.S.C. § 2254(d) (referenced herein in as " § 2254(d)" or "AEDPA").  See Ramirez v. Castro,

17  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

18  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

19  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

20

21           [3]  Respondent lodged a number of documents in support of his motion to dismiss, which
    was ultimately withdrawn.  There are no exhibit numbers to the documents, which demonstrate
22  the litigation history of this case in the California Courts:  the Court of Appeal opinion, filed
    June 23, 2000; the California Supreme Court's order (S090421) denying review of the Court of
23  Appeal opinion, filed October 3, 2000; a Petition for Writ of Habeas Corpus (01F09930), filed by
    petitioner in Sacramento County Superior Court, with a proof of service dated November 8, 2001
24  and the order denying the petition, filed December 27, 2001; a Motion To Reconsider A Motion
    To Unseal Jury Records And Conduct An Evidentiary Hearing (02F07257), filed in Sacramento
25  County Superior Court, with a proof of service dated June 5, 2002, and an order filed September
    4, 2002, denying the petition; and the Petition for a Writ of Habeas Corpus filed in the California
26  Supreme Court and the order denying it, filed July 9, 2003.

1  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

2  not address the merits of petitioner's Eighth Amendment claim).[4]  Courts are not required to

3  address the merits of a particular claim, but may simply deny a habeas application on the ground

4  that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

5  Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000), in which the Ninth Circuit required district

6  courts to review state court decisions for error before determining whether relief is precluded by

7  § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

8  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

9        The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

10  different.  As the Supreme Court has explained:

11        A federal habeas court may issue the writ under the "contrary to"
          clause if the state court applies a rule different from the governing
12        law set forth in our cases, or if it decides a case differently than we
          have done on a set of materially indistinguishable facts.  The court
13        may grant relief under the "unreasonable application" clause if the
          state court correctly identifies the governing legal principle from
14        our decisions but unreasonably applies it to the facts of the
          particular case.  The focus of the latter inquiry is on whether the
15        state court's application of clearly established federal law is
          objectively unreasonable, and we stressed in Williams [v. Taylor,
16        529 U.S. 362 (2000)] that an unreasonable application is different
          from an incorrect one.

17

18  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

19  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

20  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

21  (2002).

22  _____

23        [4] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
    held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
    claims will have no determinative effect in the case before us . . .  At best, it is constitutional
24  dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
    relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
25  28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
    of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
26  Ramirez, 365 F.3d at 773-75.

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III.  The Trial Court's Dealings With The Deadlocked Jury (Am. Pet., Mem. P. & A., Argument I)

Petitioner argues that the verdict on count four was coerced because the trial judge refused to accept the jury's declaration of an impasse, but rather sent jurors back several times for deliberations after giving them a modified Allen[5] charge, and ultimately commented on the evidence after learning Juror Ten's thought processes.  Am. Pet. at 49-56.

/////

/////

/////

/////

---

[5]  An Allen instruction "is traditionally understood as an instruction to work towards unanimity by considering the views of others when a jury had reached an impasse in its deliberations."  Rodriguez v. Marshall, 125 F.3d 739, 750 (9th Cir. 1997), overruled in part on other grounds, Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002).  The case that gives the instruction its name is Allen v. United States, 164 U.S. 492 (1896).

A.  Factual Background

The jury was instructed late in the afternoon of September 17, 1998 and returned for deliberations on Friday, September 18.  CT[6] 548, 549.  The jury sent four communications that day, asking that testimony be reread and exhibits provided and posing a question about the law.  CT 550-553.  The jury reconvened on Tuesday, September 22, and asked for additional exhibits to be provided for its review.  CT 558, 559.

On the third full day of deliberations, September 23, the jury asked for an additional exhibit, but by 2:00 p.m. informed the court that it was unable to reach a verdict on counts three and four (the robbery and oral copulation of Deanna S.).  CT 560-561, 571.  Before the parties arrived in court, however, the jury reached a verdict on count three (the robbery).  CT 571; RT 1896.  The court accepted the verdicts on counts one through three and asked if there was any hope that further deliberations would lead to a verdict on count four.  RT 1907.  Juror Three, the lead juror, replied that "there would have to be some clarification on . . . reasonable doubt."  Id.  Juror Three added that there was "some concern on the part of some of the jury as to what constitutes reasonable doubt, and . . . also some concern about what constitutes advocacy as opposed to . . . facts. . . ."  RT 1907-1908.  The court pressed Juror Three to explain the concern about advocacy, cautioning that the juror should not discuss any of the group's thought processes.  RT 1908.  Juror Three replied that some members of the jury thought there was "a basic unfairness," which colored the view of the evidence.  RT 1909.  The court asked the jurors to return to the jury room and consider CALJIC No. 2.90, the instruction on burden of proof, RT 1909, and said it would check with them "to see if any progress has been made with respect to reaching a verdict as to Count Four. . . ."  Id.

When the jury returned, Juror Three reported that jurors still had been unable to reach a verdict, but said one of the jurors wished to address the court.  RT 1915.  The judge

_____

[6]  The Clerk's Transcript is mislabeled "Clerk's Supplemental Transcript."

reminded them that he did not want to hear about the jurors' thought processes; when Juror Three

said the concern was "not with regard to specific evidence," the court invited the juror to put the

thoughts in writing.  RT 1915-1916.  The jury was then excused for the evening.  RT 1916.

On September 24, Juror Three sent the court the written communication from

Juror Ten, which read:

> I am unable to vote for a guilty verdict on charge No. 4.  My
> reasons are as follows: I am of the opinion that the methods used in
> collecting the evidence from which the sole sperm sample (purple
> shirt) was lifted may have contaminated the evidence because of
> time lapse and handling procedures.  Further, I can not come to the
> absolute conclusion that the processes and procedures utilized at
> arriving at the DNA match have proven to be infallible as the only
> indication of Mr. Smith [*sic*] guilt on this charge.
>
> For me the choices are:
>
> 1.  Was Mrs. S[].'s unreliable identification of her attacker
> credible?
>
> 2.  Did Mr. Smith, according to his statement, admit to the other
> three charges and only deny the fourth?
>
> 3.  Are the Sacramento County Crime Lab's findings based on the
> DNA match the only credible evidence on this charge?
>
> Unfortunately, for me, there is not one absolute conclusion on this
> charge.  Therefore, I have a reasonable doubt and in good
> conscience cannot vote for conviction.
>
> Further, in deliberating the charge I voiced my concerns and
> opinions that ultimately I do not believe this person received
> adequate representation because the expert testimony was not
> helpful or enlightening in supporting the defense's arguments.
> Further, I stated that I feel that if the defendant could have afforded
> a better defense team he would have fared better.

CT 628-629.  As the court considered this communication, the jury continued to deliberate and

 asked for additional evidence and testimony.  CT 580; RT 1920.

The court provided its proposed <u>Allen</u>-style instruction for counsel's review;

defense counsel objected to the coercive impact, particularly because the court and the parties

had become inadvertently aware of one juror's thought processes.  RT 1923.  The court called the

11

1   jury into the courtroom and gave the further instruction:

2                  Ladies and gentlemen of the jury, you reported to me yesterday you
3 were unable to reach a verdict on the charges in Count Three and
Four.  It has been my experience on more than one occasion that a
jury which initially reported it was unable to reach a verdict was
4 ultimately able to arrive at verdicts on one or more of the counts
before it.

5

6                  In fact, yesterday after further deliberations, you were ultimately
able to arrived [*sic*] at a verdict on Count Three.

7                  I had the impression after discussing with you your concerns in
open court, that it was your thought that further deliberations may
8 not have been possible or fruitful on Count Four, yet you
deliberated another 45 minutes on that count.

9

10                  You also indicated to me that one juror wished to address the
Court.  I informed you the juror could address the Court, but it
would have to be in writing.  I further informed you juror [*sic*]
11 could communicate to me directly on through the foreperson.

12                  A written communication was delivered to me today from that
juror.  The juror expressed several concerns in the communication.
13 To assist you in your further deliberations and to address the
concerns expressed in the communication, I am willing to further
14 instruct you in this case as follows.

15                  Your goal as jurors should be to reach a fair and impartial verdict
based solely on the evidence presented and without regard for the
16 consequences of your verdict regardless of how long it takes to do
so.  What your duty as jurors is to carefully consider, weigh and
17 evaluate all of the evidence presented at the trial, to discuss your
views regarding that evidence and to listen to and consider the
18 views of your fellow jurors.

19                  In the course of your further deliberations, you should not hesitate
to reexamine your own views or to request your fellow jurors to
20 reexamine their views.  You should not hesitate to change your
view once held if you are convinced it is wrong or to suggest other
21 jurors change their views if you are convinced they are wrong.  Fair
and effective jury deliberations require a frank and forthright
22 exchange of views.

23                  As I previously . . . instructed you, each of you must decide the
case for yourself, and you should do so only after a full and
24 complete consideration of all of the evidence with your fellow
jurors.  It is your duty as jurors to deliberate with the goal of
25 arriving at a verdict on the charge if you can do so without violence
to your individual judgment.

26

Both the People and the defendant are entitled to the individual judgment of each juror. As I have previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

May I suggest, however, that since you have not been able to arrive at a verdict using the methods you have chosen, that you consider changing the methods you have been following, at least temporarily, and try new methods.

For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse roll [*sic*] playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable each of you to better understand the others [*sic*] positions.

By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how you conduct your deliberations. I merely believe you may find it productive to do whatever is necessary to ensure that each juror has a full and fair opportunity to express his or her views and to consider and understand the views of the other jurors.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .. . . . . . . . . .. . . . . . .

I hope my comments and suggestions may be of some assistance to you. You are now directed to resume your deliberations.

If you have not arrived at a verdict by 4:30 this afternoon, I will reconvene court at that time and inquire whether or not you have made any progress in your deliberations. The answer you . . . give will determine what further action I take, if any . . . .

RT 1927-1931. During this explanation of impasse-breaking techniques, the court also suggested

the jury review certain instructions explaining the duties of jurors to deliberate and the proper

way to approach their task. RT 1929-1930.

Later, the jury sent a note to the court, saying "we have reviewed the instructions

and have rediscussed the evidence at length, we are unable to reach a verdict." CT 581; RT

1933. The court said it would respond to the continued deadlock the next day. RT 1933.

The jury returned for deliberations on September 25. CT 594. Outside the jury's

presence, the court told the parties he planned to comment on the evidence; defense counsel

objected with argument.  RT 1936-1942.  When the jury returned to the courtroom, the court

instructed them:

> Ladies and gentlemen, in reviewing the ten communications you have sent to the Court since you began your deliberations on September 18th, 1998, it appears to the Court that the question as to who actually perpetrated forcible oral copulation upon Deanna S[]. is a matter of controversy among you.
>
> You are, of course, the exclusive judges of the facts, and it is your duty, if you can, to arrive at a verdict one way or another.  To that end, I am going to exercise the priviledge [sic] that I have under the laws of the state to comment on the evidence, not to impose my will on you in any way, but simply to have you review certain evidence you may not have considered or discussed during your deliberations.
>
> In my view, it is important that you consider the statements defendant Anthony Smith and James Hinex made to law enforcement following their arrests.
>
> Accordingly, after I have completed my comments, I am going to have those statements played in open court.  As you listen to their statements, you should read the transcript which you have been provided with that corresponds to the statement you're listening to.  When listening to their statements, you should compare their statements against each other.  You should listen for consistencies in there [sic] statements as well as inconsistencies.  Consistencies in statements and inconsistencies in statements are proper areas to consider in evaluating evidence.
>
> Among the consistencies and inconsistencies you will hear in James Hinex' statements to Detective Willover, Hinex tells Willover that he and Smith went up to the front door of the S[] home.  Hinex said Smith pretended to sell the newspaper.  Hinex said Smith went inside the house.  Hinex denied going inside the house.
>
> In Hinex' statements to Detective Willover and Detective Ware, Hinex said that Smith was the guy who went into the house.  Hinex said Christopher was not at the house when the incident occurred.  Hinex denied going into the house.
>
> Hinex said Smith went to the back of the house with a gun and closed the door.  Hinex said Smith was the only one who ran out of the house.  In Smith's statement to Detective Willover, he told Willover he and Hinex went in the front door with a gun.  Smith told Willover he and Hinex went to the house and Chris stayed in Rob's house.  Smith told Willover Chris did not go in the house.

Smith said he and Hinex went inside the house.  Smith said that he found Ms. S[]. in one of the back bedrooms.  Smith said he had the gun when he was back there with Mrs. S[].  Smith said that Mrs. S[]. gave him a $100 bill.

There are other consistencies and inconsistencies you will hear in their statements, but these are the most significant in my view.

Get this document [apparently one of the transcripts of the tape].

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . .

So, ladies and gentlemen, I will ask you to put aside this instruction for the time being.  I have further comment that I will read to you per this instruction, and right now I'm going to have the bailiff play back the indicated tapes.  You should all have a transcript of each of these tapes in the order that I just indicated.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[tapes were played]

Ladies and gentlemen, I again ask that you take out the instruction that I provided you this morning.  I'm going to continue with reading of that instruction.

Examine closely areas where you find the consistencies and inconsistencies and then relate those areas to the issue as to who actually perpetrated the forcible oral copulation upon Deanna S[].

After making a comparison of the statement of Anthony Smith and James Hinex to law enforcement, consider and discuss how this comparison affects your finding as to who perpetrated the act of forcible oral copulation . . . .

My comments are advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses.

I also remind you again that both the People and the defendant are entitled to the individual opinion of each juror.  It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so.  Each of you must decide the case for yourself but should do so only after a discussion of the evidence and instructions with the other jurors.

You should not hesitate to change an opinion if you are convinced it is erroneous; however, you should not be influenced to decide any question in a particular way because the majority of the jurors or any of them favor such a decision.

15

1    And when you are discussing and deliberating, remember, too, you
     are not partisans or advocates in this matter, but you are judges.
2
     And now I ask that you return to the jury room keeping the
3    instruction I have given you this morning in mind together with all
     of the other instructions that I have given you, continue your
4    deliberations and attempt to reach a verdict if you can.

5    Now, ladies and gentlemen, I want you to take the transcripts, take
     the instruction that I just gave you, go ahead take your notebooks
6    with you. . . . .

7    RT 1946-1951.  After the court instructed, defense counsel noted that she would have asked the

8    court to mention other sections of the three statements.  RT 1951-1953.

9            The jury resumed deliberations at 1:30 and notified the court at 2:38 p.m. that it

10   had reached a verdict on count four.  CT 594; RT 1957-1958.[7]

11        B.  The Court Of Appeal's Decision

12   Defendant contends that the trial court effectively coerced a guilty
     verdict on count 4 (forcible oral copulation) by commenting on the
13   evidence after the jury had reached a deadlock and by making it
     clear to the jury that the court wanted a guilty verdict.  We
14   disagree.

15   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17   Defendant contends that the trial court violated the standards for
     appropriate judicial comment on the evidence . . . .  On the
18   contrary, the trial court stayed well within the limits staked out by
     the California Constitution and the relevant case law. . . .
19
     1.  The court's actions before commenting on the evidence
20
     At the threshold, defendant asserts that the court erred by failing to make
21   clear to juror No. 10 that written comments revealing the juror's thought
     processes were improper.  We disagree.
22

23   /////

24   _____

25       [7]  As the jury left the courtroom, Juror Number Nine gave a note to the bailiff,
     complaining about the course of deliberations and suggesting she would not return after lunch.
     The court did not notify the parties about this note until it called them back for the return of the
26   verdict.  Petitioner's challenge on this issue is addressed in section IV below.

1      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . .

2      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3      Defendant also asserts that even before the trial court commented
on the evidence it revealed it was "unwilling to accept the jury's
4      inability to reach a verdict on count four" when it insisted that the
jury return "again and again" for further deliberation and when it
5      reinstructed the jury on the proper methods of deliberating.  But
defendant does not explain why the trial court should have
6      concluded then that the jury would never be able to reach a verdict.
[fn omitted].  Nor does he cite any authority supporting his claim
7      that the court acted improperly by urging the jury to continue
deliberating.  "The determination whether there is reasonable
8      probability of agreement rests in the sound discretion of the trial
court. . . ."  Defendant has not shown that the court abused its
9      discretion by urging the jury to keep deliberating at that point.

10      2.  <u>The court's comments on the evidence.</u>

11      Defendant asserts that the court improperly focused on the
incriminating statements the two defendants made to the police and
12      "specifically referenced the inconsistencies which, in the court's
view, supported a verdict of guilt."  He is mistaken.
13

14      First, it was not improper for the court to highlight the defendants'
statements to the police.  Since those statements contradicted each
other as to which defendant, if either, perpetrated the forcible oral
15      copulation, this was obviously key evidence on which to focus the
jury's attention.  (Furthermore, since Hinex's testimony grossly
16      contradicted his statements to the police, the effect of calling the
jury's attention to those statements could have been more
17      damaging to Hinex's credibility than to defendant's.)

18      Second, the court did not "specifically reference[]" any particular
inconsistency to defendant's detriment.  The court merely
19      mentioned factual claims made in each statement and indicated the
jury should assess the statements both for "inconsistencies and
20      consistencies."  The court did not suggest that the jury should find
either defendant or Hinex the more credible of the two based on
21      any inconsistencies in their stories.  Nor did the court suggest any
inference as to guilt or innocence the jury should draw from such
22      inconsistencies.

23      Indeed, the court's comments fell well within the latitude allowed
to trial courts under the law.  The Constitution expressly permits a
24      trial court to comment on a witness's credibility.  (Cal. Const., art.
VI, § 10.)  In a proper case, a trial court may state outright that
25      specific evidence causes the court to doubt whether a specific
witness was credible. . . .

26

1          Defendant also complains that, while focusing the jury's attention on the pretrial statements, "the court totally ignored the trial testimony of Hinex containing his explanation for why he had not implicated Chris McCurin, his cousin, in his statements." However, when commenting on the evidence a trial court need not and cannot cover every point that either party might wish mentioned. . . .  The trial court could reasonably have decided that the evidence it chose to comment on was more directly relevant to resolving the jury's difficulties than the testimony defendant cites (which, in any event, the court could presume the jury had in mind).

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant has shown no error in the trial court's comments on the evidence.

Court of Appeal Opinion (Op.) at 12-25.

C.  <u>Analysis</u>

In <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988), the Supreme Court held:

Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.

Whether a verdict was coerced must be determined by a consideration of a court's action "in . . . context and under all the circumstances." <u>Id</u>. at 237.  Petitioner argues that the totality of the circumstances in this case, from the court's awareness of Juror Ten's reasons for not being able to reach a verdict on count four, through the initial instruction to jurors informing them of their duty to reach a verdict without "doing violence" to individual views, through the court's comment on the evidence, shows that the verdict was coerced.  Pet., Mem. P. & A. at 53-56. Respondent divides the episode into discrete parts and then posits that there is no clearly established federal law prohibiting a juror from disclosing his thoughts, or forbidding the court to urge the jury to reach a verdict or from commenting on the evidence.  Answer at 18-19.  While respondent cites <u>Lowenfield</u>, he does so only to argue that when a court's questions did not require a juror to reveal his thought processes, the questions posed did not violate the Constitution.  Respondent does not acknowledge the directive of the Court in <u>Lowenfield</u> to

1   examine the totality of the circumstances, by "consider[ing] the supplemental charge given by the

2   trial court 'in its context and under all the circumstances.'" Lowenfield, 484 U.S. at 237.

3          In this case, the "context and circumstances" of the court's interaction with the

4   jury had several components.  Whether or not the trial court could or should have anticipated that

5   his invitation to the jury foreman, however carefully qualified, might cause Juror Ten to discuss

6   the progress of deliberations is not determinative; what is important is that the trial court became

7   aware of the basis of Juror Ten's belief that the prosecution had not proven its case against

8   petitioner beyond a reasonable doubt.

9          Allen instructions have generally been found not to be coercive unless they

10  encourage jurors "to abandon, without any principled reason, doubts that any juror

11  conscientiously holds," Smalls v. Batista, 191 F.3d 272, 279 (2d Cir. 1999), or "unduly

12  emphasize the importance of reaching a verdict." Gilbert v. Mullin, 302 F.3d 1166, 1174 (10th

13  Cir. 2002).  While a judge's awareness of the jury's division may mean that his determination to

14  give an Allen instruction is coercive, "it is not per se impermissible for the state trial judge to ask

15  the jury to continue deliberating." Coleman v. Quarterman, 456 F.3d 537, 548 (5th Cir. 2006),

16  petition for cert. filed, ___ U.S.L.W. ___ (U.S. Dec. 11, 2006) (No. 06-8399).

17         In this case, the trial court told the jury that the first supplemental instruction was

18  designed to "assist you in your future deliberations and to address the concerns expressed in

19  [Juror Ten's] communication."  It did not insist that the jurors reach a verdict, but reminded them

20  twice that their "goal as jurors" was to reach a verdict.  The court told the jurors that they should

21  "not hesitate to reexamine [their] views" or to "change a view you once held if you are convinced

22  it is wrong or to suggest other jurors change their views . . .," but also told them they should

23  reach a verdict only if they could do so "without violence to [their] individual judgment."

24  Nevertheless, the court then suggested that the jurors "experiment with reverse role playing by

25  having those on one side of an issue present and argue the other side's position and vice versa,"

26  so they might "better understand the others position."  RT 1927-1931.  Despite the judge's

1 | assurances that the jurors should not do violence to their views, he specifically noted that the

2 | instruction was directed to the "concerns" raised by one juror, Juror Ten.  This instruction, with

3 | its exhortation to further deliberate and to change positions for purposes of "role-playing" might

4 | have been construed as being directed to Juror Ten, whose "concerns" the instruction purported

5 | to address.  Cf. Jiminez v. Myers, 40 F.3d 976, 981 (9th Cir. 1993).

6 | 　　　　　After this instruction, the jury returned to deliberate, again without reaching a

7 | verdict on count four.  The next morning, the court commented on the evidence with its second

8 | supplemental instruction.

9 | 　　　　　The Supreme Court has also held that a trial court may explain and comment on

10 | the evidence to jurors

11 | 　　by drawing their attention to the parts of it which he thinks are
important, and he may express his opinion upon the facts, provided

12 | 　　he makes it clear to the jury that all matters of fact are submitted to
their determination.

13 | 

14 | 　　. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15 | 　　This privilege of the judge to comment on the facts has its inherent
limitations.  His discretion is not arbitrary and uncontrolled, but

16 | 　　judicial, to be exercised in conformity with the standards governing
the judicial office.

17 | Quercia v. United States, 289 U.S. 466, 469-70 (1933).[8]

18 | 　　　　　Although the trial court told the jurors in this case that the ultimate decision was

19 | theirs and that he was not attempting "to impose [his] will on [them] in any way," other aspects

20 | of the court's second supplemental instruction carried a different meaning.  First, the comments

21 | focused on evidence Juror Ten had not mentioned in his note, evidence which might provide the

22 | "reliable" evidence of petitioner's guilt that the juror believed was lacking.  Second, the court

23 | went beyond mere comment on the evidence: he had the bailiff provide the transcripts of the co-

24 | 

25 | 　　[8] In Quercia, the court exercised its supervisory powers over the federal courts.  The
Ninth Circuit has looked to Quercia, however, as establishing a constitutional restriction on a
court's power to comment on evidence.  Rodriguez v. Marshall, 125 F.3d 739, 749 (9th Cir.

26 | 1997).

1  defendants' statements to the jury and ensured that the jury considered the statements by playing

2  the tapes in open court, after directing them to read along in the transcripts.  The court did more

3  than "direct [the jury's] attention" to the crucial evidence; he compelled them to consider it by

4  playing the tapes, thus undercutting his exhortation that the ultimate decision, even of what

5  evidence the jurors thought pertinent and worth further review, was the jury's.  Cf. Powell v.

6  Galaza, 328 F.3d 558, 564-65 (9th Cir. 2003) (improper comment on evidence not always cured

7  by court's assurance that ultimate determination was for the jury).

8          In United States v. Rivera-Santiago, a jury deliberating a drug smuggling charge

9  asked specific questions about the evidence as an aid to breaking its deadlock.  The parties

10  agreed on answers to three of the questions; over defense objection, the trial court selected

11  specific testimony to read to the jury in response to its fourth question.  The First Circuit

12  reversed, finding that the procedure violated the defendant's Sixth Amendment rights:

13          Although the district court may, at its discretion, reread testimony
           where the jury makes a request to have specific testimony reread
14          . . ., we have noted that the culling of testimony in response to a
           jury's open-ended question may, "in effect, make the court a finder
15          of fact," . . . and have found constitutional error where a district
           court's answer to a jury's factual question had the effect of
16          mandating that the jury reach a conclusion on a particular issue.

17  107 F.3d 960, 965 (1st Cir. 1997).  In this case, the court's insistence that the jurors not just

18  consider, but actually hear the evidence the court deemed important, similarly encroached on the

19  jury's duty to find the facts.  In United States v. Rodgers, the Sixth Circuit cautioned against

20  providing transcripts to a deliberating jury:

21          First, the jury may accord "undue emphasis" to the testimony;
           second, the jury may apprehend the testimony "out of context." . . .
22          These dangers are "escalated" if the jury makes the request after
           reporting an inability to arrive at a verdict.

23

24  109 F.3d 1138, 1143 (6th Cir. 1997); see also United States v. Montgomery, 150 F.3d 983, 999

25  (9th Cir. 1998) (recognizing that jury may place undue emphasis on transcripts requested during

26  deliberations).  Here, the court's final instruction and action went beyond the role of a judge in a

1  jury trial, for by selecting the evidence for the jury to consider after a third report of deadlock, the

2  court acted more like a fact finder; by playing the tapes for the jurors and by providing them the

3  transcripts to take to the deliberation room, the court emphasized the importance of this evidence

4  to resolving the deadlock.

5        Finally, it is significant that the jury deliberated only slightly longer than an hour

6  after receiving this last instruction, for it suggests the coercive power of the trial court's actions.

7  Compare Bonnell v. Mitchell, 301 F.Supp.2d 698, 749 (N.D. Ohio 2004) (that jury deliberated

8  for half a day more after receiving Allen instruction suggests "that the jury felt uncoerced in

9  continuing deliberations").

10        The concatenation of circumstances in this case, beginning with two reports of

11  deadlock, followed by Juror Ten's letter laying out the reasons why he could not find petitioner

12  guilty on count four, continuing with the ostensibly neutral Allen instruction -- which the court

13  directed toward the "concerns" in Juror Ten's letter--, followed by the court's determination that

14  the deadlocked jury consider not only the court's own comments on the evidence, but also listen

15  to evidence not highlighted in Juror Ten's letter and then to take that evidence into the jury room,

16  and concluding with the jury's short deliberations after the final instruction, supports a finding

17  that the verdict on count four was coerced.  Given this chronology, supported by the record in

18  this case, this court cannot say the Court of Appeal reasonably applied the requirement of

19  Lowenfield to consider the totality of the circumstances.  The Court of Appeal did not mention

20  that portion of the Allen instruction directed toward the concerns expressed by Juror Ten and

21  thus did not consider this in its evaluation of the totality of the circumstances.  The appellate

22  court also separately considered the events before the trial court's comment and then the

23  comment itself, concluding each section with discrete evaluations of the claimed error.

24  Moreover, while restating the trial court's second supplemental instruction making reference to

25  the tapes that would be replayed and the transcripts that would be delivered to jurors, the Court

26  of Appeal consistently described the trial court's final instruction as "comment" on the evidence,

1  without explaining how the trial court's requiring the jury to consider the selected evidence the

2  court itself chose, including evidence responsive to the doubts expressed by Juror Ten, qualified

3  as mere comment.  These features thus distinguish this case from Early v. Packer, 537 U.S. 3

4  (2002), in which the Supreme Court found the state Court of Appeal's determination of a jury

5  coercion claim to be reasonable for having mentioned all the circumstances petitioner argued had

6  given rise to coercion, while focusing its analysis on the points petitioner had argued on his direct

7  appeal.

8          In the habeas context, an error is harmless unless it had a "'substantial and

9  injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S.

10  619, 637 (1993).  In this case, the jury's deadlock on count four was broken a little more than an

11  hour after the court directed the jury to listen to and to read the co-defendants' statements to

12  police and instructed the jury that the inconsistencies and consistencies in the statements were

13  important to a resolution of the impasse, and a little more than a day after the court gave jurors an

14  Allen instruction urging them to work toward a verdict, crafted in response to the "concerns"

15  expressed by Juror Ten, a hold-out juror.  No matter how well-meaning the efforts of the trial

16  court, in a challenging situation, to provide balanced supplemental instructions to the deadlocked

17  jury, this court must conclude that this sequence of events had a substantial and injurious

18  influence on the jury's ultimate verdict on count four.  The petition thus should be granted on this

19  ground.

20  IV.  The Trial Court's Dealings With Juror Nine (Mem. P. & A., Argument III)

21          As the jury left the courtroom following the trial court's comment on the

22  evidence, Juror Nine gave a note to the bailiff, expressing her frustration with the course of the

23  deliberations and threatening not to return for the afternoon's deliberations because of prior

24  commitments.  CT 584-589.  The court had the bailiff instruct the juror to return for deliberations

25  after lunch.  RT 1955-1956.

26  /////

1    The court did not notify counsel about this sequence of events until they were

2    waiting for the jury to return to the courtroom with a verdict.  RT 1956.  The court provided

3    counsel with a copy of the letter and asked, "are there any other matters before I summon the jury

4    in?"  Trial counsel made no objection.  RT 1957.  The jury then returned with the guilty verdict

5    on count four.  RT 1958.

6    Petitioner raised this episode in his motion for a new trial, which was denied by

7    the trial court.  CT 611-612; RT 1970-1976.

8    The Court of Appeal rejected petitioner's claim of error on direct appeal, finding

9    that trial counsel's failure to object at the time she learned of the episode waived the issue:

10       A trial court may discharge a juror for good cause and substitute an
         alternate juror at any time before the jury has returned its verdict to
11       court. . . . [E]ven though the jury had reached a verdict by the time
         the trial court told counsel about the note from juror No. 9, defense
12       counsel could still have demanded a hearing on whether that juror
         was fit to deliberate, and the court could still have discharged the
13       juror on a showing of good cause and substituted an alternate.

14   Op. at 32.

15   Petitioner argues that this sequence of events implicated his rights to be present

16   and to a fair trial and urges the court to find the episode presumptively prejudicial within the

17   meaning of Remmer v. United States, 347 U.S. 227 (1954) (Remmer I).  Pet. Mem. P. & A. at

18   62-71.  Respondent counters that a court's *ex parte* contact with a juror may be permissible and

19   that trial counsel's failure to object to the contact before the jury returns shows there was no

20   denial of due process.  Answer at 20-21.  Respondent does not argue that the Court of Appeal's

21   finding of waiver renders the claim of error procedurally defaulted and thus has waived that

22   argument.  Chaker v. Crogan, 428 F.3d 1215, 1220-21 (9th Cir. 2005), cert. denied, ___ U.S. ___,

23   126 S.Ct. 2023 (2006).

24   In Remmer I, a juror reported that a person told him he could "profit" by voting to

25   acquit the defendant.  The judge reported the contact to the prosecutors, who called the FBI; an

26   agent interviewed the juror during the trial.  The defendant and his counsel learned of this

sequence of events only after trial.  The Supreme Court noted:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during trial, with full knowledge of the parties.

Remmer I, 347 U.S. at 229.  It remanded the case for a hearing, because, as it explained later in Remmer v. United States, 350 U.S. 377 (1956) (Remmer II), "the paucity of information" in the record made it impossible to determine whether the episode had been harmful or harmless.  Id. at 379-80.  Although it was critical of the hearing the District Court had conducted by the time of its second decision, the Remmer II court found enough information in the record to resolve the question of prejudice.

Since the Remmer decisions, the Supreme Court has considered a state habeas petition challenging *ex parte* contacts between a juror and the judge.  In Rushen v. Spain, 464 U.S. 114 (1983), during trial a juror realized that the victim of a murder that was mentioned, but that was unrelated to the charges under consideration, had been a childhood friend.  She sought two *ex parte* meetings with the judge, who asked whether her ability to decide the case would be affected and told her "not to be concerned" because "the matter probably would not be mentioned again."  The judge made no record of either conversation and did not inform defense counsel or defendants.  Id. at 116.

When defense counsel learned of the meetings, they moved for a new trial; after a hearing the judge denied the motion, finding that the communications "'lacked any significance.'"  Id.  In his federal habeas petition, Spain argued that the *ex parte* meeting had violated his right to be present.  The Supreme Court rejected the argument:

> There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial.

1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3       This is not to say that *ex parte* communications between judge and
juror are never of serious concern or that a federal court on habeas

4 corpus may never overturn a conviction for prejudice resulting
from such communications.  When an *ex parte* communication

5 relates to some aspect of the trial, the trial judge generally should
disclose the communication to counsel for all parties.  The

6 prejudicial effect of a failure to do so, however, can normally be
determined by a post-trial hearing.  The adequacy of any remedy is

7 determined solely by its ability to mitigate constitutional error, if
any, that has occurred.

8

9 Id. at 118-20 (footnote omitted); see also Smith v. Phillips, 455 U.S. 209, 218-20 (1982) (during

10 trial, juror sought employment with prosecutor's office; court held that question of juror partiality

11 could be addressed adequately in post-verdict hearing).  The Court ultimately concluded that the

12 communication in the Spain case was not prejudicial:

13       Their *ex parte* communication was innocuous.  They did not
discuss any fact in controversy or any law applicable to the case.

14 The judge simply assured her that there was no cause for concern.

15 Rushen, 464 U.S. at 121.

16       In United States v. Madrid, 842 F.2d 1090 (9th Cir. 1988), a crying juror rushed

17 from the jury room and told a court clerk that another juror had sworn at her.  The clerk told the

18 juror to resolve her differences with the juror who had insulted her and to resume deliberations.

19 In resolving the issues, the Ninth Circuit considered the interplay of the Supreme Court cases and

20 /////

21 /////

22 /////

23 /////

24 /////

25 /////

26 /////

26

1  concluded that the <u>Remmer</u> presumption of prejudice did not apply to this type of *ex parte*

2  communication:

3      *Smith* and *Rushen* firmly establish that a defendant must
        demonstrate "actual prejudice" resulting from an *ex parte*

4      contact. . . . [T]hese cases do not involve the unauthorized
        submission of "extraneous information" . . . to the jury.  Instead,

5      they involve *ex parte* contacts which did not pertain to "any fact in
        controversy or any law applicable to the case."

6      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7

8      *Remmer II* requires only that a district court, upon finding a
        "reasonable possibility" of prejudice, hold a fair *hearing*.

9  <u>Madrid</u>, 842 F.2d at 1093-94 (emphasis in original).  The court ultimately found that there was

10  no prejudice from the contact because "[t]he clerk directed his short *ex parte* comments to the

11  personal antagonism between two jurors . . . ."  <u>Id</u>. at 1095.

12      Whether petitioner had a right to be present when the trial court instructed the

13  bailiff to tell Juror Nine to return after lunch or when the bailiff communicated this message to

14  the juror, his absence did not impair his right to a fair trial.  There was no "reasonable

15  possibility" of prejudice from the exchange, which "did not pertain to 'any fact in controversy or

16  law applicable to the case.'"

17  V.  <u>Failure To Instruct On Third Party Culpability</u> (Mem. P. & A., Argument II)

18      Petitioner argues his right fully to present his defense, that Hinex or McCurin had

19  committed the sexual assault, was impaired by the trial court's failure to instruct the jury on third

20  party culpability.  Pet., Mem. P. & A. at 72-77.  The Court of Appeal rejected this argument:

21      . . . Defendant did not request the instruction he now claims was
        required, and the trial had no duty to give that instruction sua

22      sponte.

23      The trial court instructed the jury that the prosecution had the
        burden of proof beyond a reasonable doubt (CALJIC No. 2.90),

24      that this burden of proof applied specifically to identification
        (CALJIC No. 2.91), and that defendant could be convicted on

25      count 4 (the sole count as to which defendant argues third-party
        culpability) only if the jury found that he directly committed the

26      offense, rather than merely aiding and abetting it. . . .  The

27

> combination of CALJIC Nos. 2.90 and 2.91 suffices to instruct a
> jury on the defense of mistaken identity.  Thus, defendant's
> contention is that some more specific "pinpoint" instruction was
> needed to highlight his legal theory and relate it to particular facts.
> The trial court has no duty to give pinpoint instructions sua sponte.

Op. at 25-26 (citation omitted).

In California v. Trombetta, 467 U.S. 479, 485 (1984), the Supreme Court held

explicitly that due process requires "criminal defendants be afforded a meaningful opportunity to

present a complete defense."  Several Courts of Appeals, including the Ninth Circuit, have

interpreted this holding to extend to a defendant's right to jury instructions on recognized

defenses supported by sufficient evidence.  Bradley v. Duncan, 315 F.3d 1091, 1098-99 (9th Cir.

2002); Taylor v. Withrow, 288 F.3d 846, 853 (6th Cir. 2002).  These courts have relied on the

fact that the same rule is recognized in federal criminal procedure:

> As a general proposition a defendant is entitled to an instruction as
> to any recognized defense for which there exists evidence
> sufficient for a reasonable jury to find in his favor.

Mathews v. United States, 485 U.S. 58, 63 (1988).  Accordingly, a state court's failure to instruct

on the theory of the defense may implicate a defendant's due process rights.  Bradley, 315 F.3d at

1099; Barker v. Yukins, 199 F.3d 867, 875-76 (6th Cir. 1999) (erroneous self-defense instruction

deprived the defendant of a meaningful opportunity to present a complete defense).

This court need not resolve whether an instruction on third party culpability is a

"pinpoint" instruction, which a trial court need not give *sua sponte*, or an instruction on a defense

that must be given *sua sponte* under California law as petitioner argues, Traverse at 48, because

petitioner cannot show prejudice.

Because the omission of an instruction is less likely to be prejudicial than a

misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular

instruction bears an especially heavy burden.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

"An appraisal of the significance of an error in the instructions to the jury requires a comparison

of the instructions which were actually given with those that should have been given."  Id. at 154.

1    As the state Court of Appeal noted, the jury was instructed that the prosecution

2 bore the burden of proving petitioner guilty beyond a reasonable doubt.  CT 494; RT 1768.  The

3 court also instructed:

> The burden is on the People to prove beyond a reasonable doubt
> that the defendant is the person who committed the crime with
> which he is charged.
>
> If, after considering the circumstances of the identification and any
> other evidence in this case, you have a reasonable doubt whether
> defendant was the person who committed the crime, you must give
> the defendant the benefit of that doubt and find him not guilty.

CT 495; RT 1769; CALJIC No. 2.91.

10    Petitioner has not outlined what instruction should have been given nor explained

11 how any hypothetical instruction on third party culpability would have changed the manner in

12 which the jury evaluated the evidence of petitioner's identity as the person who committed the

13 sexual assault, an evaluation that would include the reasons why identity had not been shown.

14 Petitioner has not borne his "especially heavy burden" of demonstrating constitutional error.

15 VI.  Exclusion Of McCurin's and McKinsey's Statements (Mem. P. & A., Argument IV)

16    When contacted by the police, McCurin said he was not involved in the planning

17 and execution of the robbery of the S.'s.  See CT 436, 442, 448 (McCurin denies knowing being

18 involved in the planning of the robbery).  He also claimed initially that he had been dropped off

19 in Oak Park and had not been near the S.'s home, but later conceded he had driven by the home

20 when he heard all the sirens.  CT 641, 678-679.  Defense counsel sought to introduce this

21 statement and later sought to introduce that portion of McKinsey's statement in which he denied

22 knowing Mrs. S. or hearing anything about the S.'s gambling success to show consciousness of

23 guilt.  Counsel argued that the statements were not hearsay because they were offered for their

24 falsity, not for their truth.  RT 1631-1633.  The court denied petitioner's request, finding that the

25 statements were hearsay and that they did not adequately show consciousness of guilt.  RT 1641.

26 In addition, the court ruled that the statements' probative value was outweighed by the

1  consumption of time and the potential jury confusion.  RT 1639-1641.

2        The Court of Appeal rejected this claim of error.

3        To begin with, defendant makes no convincing argument that the
        statements were admissible either as nonhearsay or under a hearsay
4        exception. . . . [H]e . . . asserts . . . that their falsehood proved
        consciousness of guilt.  But he fails to explain how either
5        McCurin's or McKinsey's alleged statements, even if false, tended
        to show that either man could have perpetrated the robbery or the
6        forcible oral copulation . . . .  There was evidence tending to show
        that one or both may have been involved in the robbery at the
7        planning stage and sought to conceal this involvement from the
        police by denying any possible connection with the robbery.  But
8        even if their statements betrayed "consciousness of guilt" in that
        sense they did nothing to implicate either man as an active
9        participant in the crimes, which is what defendant needed to
        establish to prove the statements admissible on this theory.
10
        But even if the statements might have been admissible to show
11       "consciousness of guilt" on the part of McCurin or McKinsey,
        defendant makes no articulated argument in his opening brief to
12       show that the trial court abused its discretion by excluding the
        statements under Evidence Code section 352. . . . [W]e see no such
13       abuse of discretion.

14        The only evidence at trial putting McCurin inside the S.s' house
        was the brand-new story told by Hinex on the stand, which
15       blatantly contradicted his statements to the police (as well as
        defendant's).  To the extent McCurin's statements . . . might have
16       had any tendency to inculpate him in that respect, that evidence
        was cumulative to Hinex's testimony.  Furthermore, it was purely
17       speculative whether McCurin's statements even had such a
        tendency, since they could also have been taken merely to show his
18       attempt to avoid being tied in with the offenses even at the
        planning stage.  No evidence whatsoever put McKinsey inside the
19       house.  Given the weak probative value of McCurin's and
        McKinsey's statements as to any disputed issue in the case, the
20       trial court could reasonably have concluded that the time it would
        have taken to present this evidence and the possibility of juror
21       confusion outweighed any grounds for its admission.

22       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23        Finally, even assuming for the sake of argument the trial court
        erred, defendant can show no prejudice from the exclusion of this
24       evidence. . . .

25  Op. at 35-39 (footnotes, citation omitted).

26  /////

1    Petitioner argues that the exclusion of this evidence violated his right to present a

2  complete defense; respondent does not argue that the statements were properly excluded as

3  hearsay, but contends the exclusion was proper under California Evidence Code § 352.  Answer

4  at 26-28.

5    In general, a state court's evidentiary ruling is not subject to federal habeas review

6  unless the ruling violates federal law, either by infringing upon a specific federal constitutional or

7  statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by

8  due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d

9  918, 919-20 (9th Cir. 1991).

10    In Washington v. Texas, 388 U.S. 14, 22 (1967), Chambers v. Mississippi, 410

11  U.S. 284, 302 (1973) and Rock v. Arkansas, 483 U.S. 44, 55-56 (1987), the Supreme Court

12  recognized that in some circumstances, state rules of evidence cannot be used to prevent a

13  defendant from presenting reliable evidence crucial to his defense.

14    In Rock, however, and in United States v. Scheffer, 523 U.S. 303 (1998), the

15  Court examined the accommodation between a defendant's right to present a defense and the

16  government's interests in ensuring that reliable evidence is presented and avoiding litigation

17  collateral to the purpose of the trial.  Id. at 308-09.  The Court observed that rules excluding

18  evidence "do not abridge an accused's right to present a defense so long as they are not

19  'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  Id. at 308 (citing to

20  Rock, among other cases); Rock, 483 U.S. at 55-56 ("The right [to present a defense]'may, in

21  appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'").

22  /////

23  /////

24  /////

25  /////

26  /////

1    Most recently, in <u>Holmes v. South Carolina</u>, 547 U.S. 319 (2006), the Court acknowledged that

2           well-established rules of evidence permit trial judges to exclude
            evidence if its probative value is outweighed by certain other
3           factors such as unfair prejudice, confusion of the issues, or
            potential to mislead the jury.
4
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
5
            [T]he constitution permits judges to exclude evidence that is
6           repetitive . . . only marginally relevant or poses an undue risk of
            harassment, prejudice, [or] confusion of the issues.
7

8    <u>Id</u>. at 1732 (citations, quotations omitted); <u>see also</u> <u>Chia v. Cambra</u>, 360 F.3d 997, 1003 (9th Cir.

9    2004), <u>cert. denied</u> <u>sub nom.</u> <u>Lewis v. Chia</u>, 544 U.S. 919 (2005) (court must balance importance

10   of excluded evidence against state's interest in exclusion; court erred in excluding co-

11   conspirator's statements exculpating petitioner); <u>Wood v. State of Alaska</u>, 957 F.2d 1544, 1551

12   (9th Cir. 1992) ("Even though the evidence is relevant, it may properly be excluded if its

13   probative value is outweighed by other legitimate interests.").

14          Here the Court of Appeal did not apply federal law unreasonably in concluding

15   that McCurin's and McKinsey's statements were properly excluded.  That the two were not

16   forthcoming with the police suggested they were attempting to conceal some level of

17   participation in the offenses, but it did not necessarily, or even logically mean that they were

18   concealing their participation in the oral copulation, the only offense petitioner had not admitted.

19   <u>See</u> Supplemental CT (SCT) 13-19.  The ambiguity of the evidence of consciousness of guilt not

20   only diluted its probative value, it suggested the possibility of juror confusion from its

21   introduction, for the jury would be asked to discount the substance of the two statements but

22   accept the inference that the pair's lies translated into affirmative evidence placing either

23   McCurin or McKinsey or both inside the S. home.  Adding to the sources of confusion is that the

24   jury would be asked to reject petitioner's own statement that McCurin had stayed at McKinsey's

25   house when petitioner and Hinex went to the S.'s.  SCT 12-13.

26   /////

1    The state court did not unreasonably apply federal law in rejecting this claim of

2  error.

3  VII.  The Admission Of DNA Evidence (Mem. P. & A., Argument V)[9]

4    In a one-and-a-half page argument in the points and authorities, petitioner argues

5  that the admission of the DNA evidence was prejudicial because it did not satisfy the

6  requirements of the Kelly-Frye[10] test; he does not mention the serology evidence at all.  Pet.,

7  Mem. P. & A. at 77-78.  Respondent's observation that the Kelly-Frye requirements are not

8  constitutionally based appears to have prompted petitioner to change his approach, for in the

9  traverse, he offers a lengthy challenge to the reliability of the DNA and the serology evidence,

10  without mentioning his original Kelly-Frye challenge.  See Traverse at 91-112.

11    State court evidentiary rulings cannot serve as a basis for habeas corpus relief

12  unless federal constitutional rights are affected.  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.

13  1990).  The Kelly-Frye rule is a creature of California law, based on a state court ruling adopting

14  the reasoning of a federal circuit court, which was not based on the United States Constitution.

15    Petitioner's reliability argument first surfaced in his traverse and so this court

16  need not consider it.  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse

17  is not the proper pleading to raise additional grounds for relief.").  In any event, the argument

18  provides petitioner no basis for relief.

19    In Barefoot v. Estelle, 463 U.S. 880, 900 (1983), the Supreme Court considered

20  the question whether psychiatric testimony about a criminal defendant's future dangerousness

21  should be admitted during the penalty phase of capital trials.  The Court rejected the claim,

22  ─────────────────

23    [9]  This argument, and those subsequent to it, were not raised on direct appeal, but rather
   only in a state habeas petition.

24    [10]  People v. Kelly, 17 Cal.3d 24 (1976) and Frye v. United States, 293 F. 1013 (D.C. Cir.
   1923).  Under this rule as developed by the California courts, the advocate of a new scientific
25  method must establish that the reliability of the method is generally accepted, that the expert
   witness is qualified, and that the correct scientific procedures were used in the particular case.
26  See People v. Roybal, 19 Cal.4th 481, 505 (1998).

1  relying on the adversary process "to sort out the reliable from the unreliable evidence and

2  opinion. . . ." Id.  The Courts of Appeals have echoed this sentiment, rejecting habeas challenges

3  to allegedly unreliable scientific testimony because the defense had the opportunity to challenge

4  the evidence. Moore v. Gibson, 195 F.3d 1152, 1167-68 (10th Cir. 1999); Adams v. Leapley, 31

5  F.3d 713, 715 (8th Cir. 1994).

6          In his traverse, petitioner points to various discrepancies in the criminalists'

7  testimony: for example, criminalist Murphy tested petitioner's blood and then testified "on

8  Smith, I found that he was a B secretor," but toward the bottom of the same page, she identified

9  petitioner's blood type as "AB." RT 1223.  The semen donor of the sample taken from Mrs. S.'s

10  tee shirt "would have to be a type B." RT 1229.  Similarly, criminalist Spriggs identified

11  petitioner's DQ-Alpha alleles to be 1.4/4.1, RT 1332, and then suggested that he is a 1.1/4.1, RT

12  1333.  In the latter portion of the relevant testimony, Spriggs is reported as identifying the alleles

13  of the DNA of the sperm sample to be 1.14/4.1.  Id.[11]

14          Whatever the problems with this testimony, the jury heard the testimony and was

15  able to determine whether or not it was reliable.  Because it was subject to the "adversary

16  process," there was no error in its admission.

17  VIII.  Denial Of The Right To Confront (Mem. P. & A., Argument VI)

18          In a very convoluted argument, petitioner contends that he was unable to confront

19  a witness against him when, during a meeting on the parties' readiness for trial and the setting of

20  the defense's Kelly-Frye motion, the prosecutor lied and assured the court that DNA testing had

21  been concluded.  Pet., Mem. P. & A. at 78-81.  It is unclear in the petition and similarly unclear

22  in the traverse what witness petitioner would have questioned at these proceedings; it appears

23  that he is arguing that he had the constitutional right to be presented with the report during that

24  proceeding.  Whatever the basis of his argument, it is specious.

25  _____

26          [11]  These discrepancies suggest that the court reporter may have been less than attentive.

1    The Sixth Amendment right of confrontation is a trial right; it does not create a

2  right to pretrial discovery.  Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987) (right to confront and

3  cross-examine is a trial right, designed to prevent restrictions on questions during cross-

4  examination).  In addition, there is no general due process right to discovery of anything but

5  exculpatory material.  Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  Finally, petitioner was

6  given and made use of the opportunity to confront and cross-examine the criminalist who

7  conducted the DNA testing both at the Kelly-Frye hearing and at trial.  See, e.g., RT 363-379

8  (Kelly-Frye hearing); RT 1352-1373 (trial).  There was no constitutional error.  See Kentucky v.

9  Stincer, 482 U.S. 730, 740 (1987) (no confrontation clause violation even though defendant

10  excluded from pretrial hearing on witness competence when defendant had the opportunity to

11  cross-examine at trial).

12  IX.  Prosecutorial Misconduct Relating To The DNA Report (Mem. P. & A., Argument VII)

13    In another difficult-to-understand argument, petitioner appears to be claiming that

14  the prosecutor told the court that DNA testing had been completed on December 18, 1997, when

15  in fact the last tests had not been run until December 22, 1997; this caused the court to deny a

16  motion to exclude evidence, based on the prosecutor's failure to comply with the discovery

17  deadlines of the California Penal Code.  He also argues that this renders his conviction invalid

18  because it is based on false evidence, and that "the lack of said test result was favorable to

19  petitioner," so the prosecutor's failure to disclose the status of the testing violated his duty to

20  disclose favorable evidence under Brady v. Maryland, 373 U.S. 83 (1963).  Pet., Mem. P. & A. at

21  85-86.

22    This argument, too, is specious.  As noted above, there is no constitutional right to

23  discovery and the ultimate results of the DNA report, which linked petitioner to the forcible oral

24  copulation, were hardly exculpatory.  To the extent petitioner is arguing that the prosecutor's

25  failure to comply with the state rules concerning the provision of discovery was error, the claim

26  is not cognizable on federal habeas corpus.  "[F]ederal habeas corpus relief does not lie for errors

1  of state law." <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990).

2      Finally, petitioner suggests that the prosecutor's late disclosure of the DNA results

3  caused the trial to be reset and thus deprived him of his right to a speedy trial.  Once again,

4  however, a violation of the speedy trial requirements of California Penal Code § 1382 does not

5  raise a federal question.  <u>Tinsley v. Borg</u>, 895 F.2d at 530.  Nor has petitioner shown the sort of

6  delay that raises a federal question: the trial began approximately nine months following his

7  arrest, a period of time the Ninth Circuit has found is not presumptively prejudicial.  <u>Arnold v.</u>

8  <u>McCarthy</u>, 566 F.2d 1377, 1382-83 (9th Cir. 1978) (delay of nine months in robbery case not

9  prejudicial).  His claim of the witnesses' fading memories similarly does not raise federal speedy

10 trial concerns.  <u>See generally</u> <u>Barker v. Wingo</u>, 407 U.S. 514, 530-32 (1972); <u>United States v.</u>

11 <u>Lam</u>, 251 F.3d 852, 860 (9th Cir. 2001).

12 X.  <u>Ineffective Assistance Of Trial Counsel</u> (Mem. P. & A., Argument VIII)

13     Petitioner argues that trial counsel was ineffective in failing to conduct the

14 necessary investigation, which would have disclosed that the DNA testing had not been

15 completed on December 18 as the prosecutor asserted; as a result, he claims, defense counsel did

16 not make a motion to dismiss for the discovery violation.  Pet., Mem. P. & A. at 89-93.

17     The federal law on claims of attorney ineffectiveness is clear:

18     First, the defendant must show that counsel's performance was
   deficient.  This requires showing that counsel made errors so
19     serious that counsel was not functioning as the 'counsel'
   guaranteed by the Sixth Amendment.  Second, the defendant must
20     show that the deficient performance prejudiced the defense.

21 <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

22 whether counsel's assistance was reasonable considering all the circumstances." <u>Id</u>. at 688.

23 Accordingly, this court must determine whether in light of all the circumstances, the identified

24 acts or omissions were outside the wide range of professional competent assistance and a

25 petitioner must overcome the presumption that the act or omission might be an appropriate

26 strategic decision.  <u>Id</u>. at 689, 690.

1    It is also petitioner's burden to establish prejudice: "A defendant must show that

2 there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

3 proceeding would have been different. A reasonable probability is a probability sufficient to

4 undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. A court may address

5 prejudice without first determining whether counsel's performance was deficient. <u>Id.</u> at 697.

6    Petitioner cannot bear his burden of demonstrating prejudice. Even assuming that

7 the report was not completed and that the court would have granted a motion to dismiss,

8 petitioner has not suggested, much less shown, why the charge would not have been refiled. Cal.

9 Penal Code §§ 1387, 1387.1.

10 XI. <u>Ineffective Assistance Of Appellate Counsel</u> (Mem. P. & A., Argument IX)

11    Petitioner contends that appellate counsel was ineffective for failing to challenge

12 trial counsel's inadequate performance in connection with the DNA report, to argue that the

13 introduction of the DNA evidence violated the <u>Kelly-Frye</u> standards, to note the discrepancies in

14 the record concerning the serology and DNA tests, and to present the claims of prosecutorial

15 misconduct and subsequent loss of the right to a speedy trial, as outlined above. Pet., Mem. P. &

16 A. at 93-99.

17    The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel. <u>Smith</u>

18 <u>v. Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

19 Moreover, an indigent defendant "does not have a constitutional right to compel appointed

20 counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

21 professional judgment, decides not to present those points." <u>Jones v. Barnes</u>, 463 U.S. 745, 751

22 (1983). Counsel "must be allowed to decide what issues are to be pressed." <u>Id.</u> Otherwise, the

23 ability of counsel to present the client's case in accord with counsel's professional evaluation

24 would be "seriously undermined." <u>Id.</u>; <u>see also</u> <u>Smith v. Stewart</u>, 140 F.3d 1263, 1274 n.4 (9th

25 Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

26 not even particularly good appellate advocacy."). There is, of course, no obligation to raise

1   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

2   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

3   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

4   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

5   prevailed on appeal.  Id. at 1434 n.9.

6          None of the issues that petitioner has raised in this claim and in his state habeas

7   petitions would have resulted in a favorable resolution of his appeal.  Appellate counsel was not

8   ineffective for failing to raise them.

9          IT IS HEREBY ORDERED that:

10         1.  Petitioner's July 19, 2006 motion to substitute B. Curry as respondent is

11   granted.

12         2.  The Federal Defender's Office is appointed to represent petitioner.

13         3.  The Clerk is directed to serve a copy of these findings and recommendations

14   on the Federal Defender's Office.

15         IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

16   habeas corpus be granted as to the jury coercion claim but be denied in all other respects.

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:  March 19, 2007.

10

11

12    U.S. MAGISTRATE JUDGE

13

14

15  2/smit1871.157

16

17

18

19

20

21

22

23

24

25

26